# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

LEE TOMMIE AMERSON                                               PLAINTIFF

v.                                          CIVIL ACTION NO. 4:23-CV-00132-RP

CAPT. ROBERT DUDLEY, et al.                                      DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Plaintiff Lee Tommie Amerson, proceeding *pro se* and *in forma pauperis*, filed the instant suit against Defendants challenging the conditions of his confinement under 42 U.S.C. § 1983. Defendants moved for summary judgement, to which Amerson responded, and Defendants filed a rebuttal. The matter is now ripe for resolution. For the reasons set forth below, the Court finds that Defendants' motion should be granted, and the instant action will be dismissed with prejudice.

## Factual and Procedural Background

Amerson is an inmate in the custody of the Mississippi Department of Corrections ("MDOC") and housed at the Mississippi State Penitentiary ("MSP") located in Parchman, Mississippi. Doc. # 1. The bulk of Amerson's allegations stem from an incident which resulted in him receiving Rule Violation Report ("RVR") #01859490. *See* Doc. #s 1-1, 1-2. According to Amerson, Defendants conspired against him in falsely accusing him of misconduct resulting in the aforementioned RVR and accompanying institutional punishment. *Id.*

The RVR followed a November 6, 2022, altercation between Amerson and another inmate, Ira Clayton. *Id.* Amerson contends that, while in the bathroom, Clayton attacked him from behind, hitting him with a blunt object three times. *Id.* Amerson allegedly suffered injury to the left side of his face, with his left eye swollen shut and a swollen left forearm from blocking a hit. *Id.* That

initial incident was broken up momentarily; Amerson went to his bunk to compose himself then "went back to fight him" some more. *See* Doc. # 1-1 at 3.

Officer Berkedius Womack was on the scene and wrote the report forming the basis of the RVR. *See* Doc. # 67-1. According to Womack, there was a commotion in the zone, and he first located Clayton who had blood on his shirt. *Id.* Clayton told Officers Womack and Vanessa Price that Amerson assaulted him with a weapon. *Id.* Womack additionally noted that Amerson had blood on his face. *Id.* Womack declared that he conducted a search and "confiscated a homemade icepick 6 inches long from under inmate Amerson['s] locker box." *Id.* Clayton suffered minor injuries, mostly superficial abrasions, and received medical attention. *See* Doc. # 67-2.

RVR #01859490 charging Amerson with possession of major contraband was issued and rested on the following evidence: confiscation of the weapon found under Amerson's locker box, Womack's report, and a review of camera footage. *See* Doc. # 67-3. Amerson was placed on restrictive housing pending investigation. *See* Doc. # 67-5 at 13, 15. On November 8, 2022, Amerson filed a response to the report; interestingly, he did not deny that he assaulted Clayton altogether, rather he merely asserted that he used an ink pen, not an icepick. *See* Doc. # 67-4. Initially set for a hearing on November 10, 2022, the matter was tabled by Major Sharon Hampton. *See* Doc. # 67-3. Amerson alleges that Hampton decided to table the hearing when she saw the injuries on his face and told him that she and Warden McDonald would watch video footage of the incident. *See* Doc. # 75 at 2.

Then, on November 14, 2022, Amerson appeared for a hearing on the RVR. *See* Doc. # 67-5 at 11. Amerson avers that Hampton advised him that she and Warden McDonald had watched the video footage and that, while they did not see him with an icepick, they did see something in his hand, and asked him what it was, to which he showed them the ink pen. *See* Doc. #s 1-2 at 3; 75 at 3. Amerson believed that witnesses would corroborate his account of the incident; Hampton,

however, advised him that Investigator Martha Hunter had called to get those witness statements, but the purported witnesses—Mark Conner and Antowin Porter—refused to give statements. *Id.*; *see also* Doc. # 67-5 at 12.

Amerson avers that, immediately upon walking in the room for the hearing, he saw Hampton's paperwork and it already had him marked as "guilty" before the hearing had even begun. *Id.* Amerson asked Hampton why she already marked him as "guilty" to which she allegedly replied that her supervisor told her to find him guilty. *Id.* On the RVR, Hampton indicated that Amerson was found guilty "due to evidence from camera footage." *See* Doc. # 67-5 at 11.

As punishment, Amerson received a 180-day loss of canteen and visitation privileges and a recommendation that his custody status be reviewed. *Id.* Amerson appealed the decision by filing an Administrative Remedy Program ("ARP") grievance which was received in December of 2022. *Id.* at 22. In a First Step Response dated March 21, 2023, Deputy Warden Dekota White denied Amerson relief, noting that "camera footage was watched," which depicted Amerson "with an object in [his] hand running behind Inmate Ira Clayton" and that the contraband was found under Amerson's locker box. *Id.* at 23. The First Step Response advised Amerson that he had "fulfilled the requirements of the [ARP] for an RVR appeal and [wa]s eligible to seek judicial review within 30 days of receipt." *Id.* Amerson filed two lawsuits appealing the RVR in the Sunflower County Circuit Court; the circuit court consolidated the two actions and dismissed them with prejudice. *See* Doc. # 67-6.

Amerson further alleges that Captain Robert Dudley encouraged threats and assaults against him by other inmates in retaliation for grievances Amerson filed about Dudley. Doc. # 1. According to Amerson, Dudley displayed an aggressive attitude towards him beginning on

December 6, 2022, the very first day he was placed in Dudley's unit.[1]  *See* Doc. # 1-4.  Amerson further alleges that Dudley entered the zone on or about April 4, 2023 or April 6, 2023, and made a loud statement that he (Amerson) should keep filing grievances against him; Amerson believes that Dudley made this statement so that the other prisoners would view him as a snitch.  *See* Doc. #s 1 at 8; 1-4.  Amerson opines that Dudley's statement placed him in danger as many inmates already believed him to be a snitch because he was known as a "writ-writer."  Doc. # 1-4.

Amerson *seemingly* theorizes that his cellmate, Quinton Carter, attacked him on April 6, 2023, because of Dudley's statements.  Doc. # 1 at 8-9.  MDOC records, however, indicate that the assault occurred due to Carter's belief that Amerson had stolen from him; the records indicate that Amerson actually threw the first punch to which Carter responded in kind.  *See* Doc. # 67-8 at 9.  Both inmates received medical attention, and both were issued RVRs.  *See id.*  Amerson also believes that Dudley falsified the positive results for methamphetamines from his urinalysis test taken on April 6, 2023, resulting in RVR # 2047864.

The Court will not recount every single allegation propounded by Amerson, but will note that he advances a multitude of similar allegations regarding officers' statements implying that he was a snitch and the resulting threats from other inmates.  *See* Doc. #s 1, 1-1, 1-2, 1-2, 1-4. Amerson additionally asserts a host of allegations regarding a general belief of bias and mistreatment by officers.  *See id.*  Following a number of complaints regarding the alleged mistreatment and threats of harm, Amerson was transferred from MSP to East Mississippi Correctional Facility ("EMCF") on August 4, 2023.  *See* Doc. # 67-7.

Amerson filed the instant action on July 19, 2023, alleging that Defendants violated his constitutional rights by conspiring against him in falsely accusing him of misconduct resulting in

---

[1] Amerson actually stated he was placed in Dudley's unit on December 6, 2023, *see* Doc. # 1-4,  but based on MDOC records, it appears that this was a scrivener's error, and that he meant to say December 6, 2022, the actual date he was placed in Building 29 Zone H.  *See* Doc. # 67-7.

institutional punishment and also in allegedly encouraging or facilitating threats and assaults again

him by other inmates. *See* Doc. # 1. He further contends that many of these actions were taken in

retaliation for his complaints about various MSP employes. *See id.* Amerson names Captain

Robert Dudley, Major Sharon Hampton, Investigator Martha Hunter, Warden Tracy McDonald,

Deputy Superintendent Matthew Reynolds, Major Laquitta Meeks, and Officer Vanessa Price as

Defendants. [2]

By way of relief, Amerson requests $500,000 in monetary damages and additionally asks

that lost time from his 30/30 trusty status be restored from the date that he was placed in "close

custody" status. *Id.* at 14. On May 4, 2024, Defendants filed a motion for summary judgment.

Doc. # 67. Amerson filed responses in opposition on July 2, 2024, *see* Doc. # 75, and July 9, 2024.

*See* Doc. # 76. Defendants filed a rebuttal on July 16, 2024. Doc. # 77. The matter is now ripe

for resolution.

## Summary Judgment Standard

Summary judgment is appropriate only when the pleadings and evidence, viewed in the

light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists,

and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is deemed "material if its resolution in favor of

one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star*

*State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (citation and internal quotation mark omitted).

"The moving party must show that if the evidentiary material of record were reduced to admissible

evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck*

---

[2] Amerson originally named Officer B. Womack as a defendant as well, *see* Doc. # 1, but Womack was later
dismissed with prejudice from this action. *See* Doc. #s 45, 46.

*v. Texas State Bd. Of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *see also Celotex*, 477 U.S. at 323. In other words, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986); *see also Beck*, 204 F.3d at 633. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 871-73(1990), "unsubstantiated assertions," *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994). If no proof is presented, however, the Court does not assume that the non-movant "could or would prove the necessary facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## Eleventh Amendment Immunity

The Eleventh Amendment provides, in pertinent part, that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. CONST. amend. XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). Congress did not abrogate Eleventh Amendment immunity in enacting Section 1983, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), nor has Mississippi waived its right to sovereign immunity. *See* Miss. Code Ann § 11-46-5(4) ("Nothing contained in this chapter shall

be construed to waive the immunity of the state from suit in federal courts guaranteed by the Eleventh Amendment.")

Sovereign immunity further extends to protect any state agency when that agency is "an arm of the state," and state officers acting in their official capacities. *See McCarthy v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004); *Daigle v. Gulf State Utilities Co., Local Union Number 2286, et al.*, 794 F.2d 974, 980 (5th Cir. 1986). It is well-established that MDOC is an arm of the State of Mississippi and cloaked with Eleventh Amendment immunity from suit. *See Towns v. Miss. Dept. of Corr.*, 2020 WL 1249904 (N.D. Miss. Mar. 16, 2020); *Williams v. Miss. Dept. of Corr.*, 2012 WL 2052101, at *1-2 (S.D. Miss. June 6, 2012); *Dandridge v. Miss.*, 2009 WL 4940105, at *7 (S.D. Miss. Dec. 14, 2009). Likewise, all named Defendants, in their official capacities, are also "arms of the state" for purposes of Eleventh Amendment immunity. *Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 671, 677 (N.D. Miss. 2013); *see also Am. Bank & Tr. Co. of Opelousas v. Dent*, 982 F.2d 917, 921 (5th Cir. 1993) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)) ("a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself.").

Consequently, Defendants are not amenable to suit for claims brought under Section 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989), with the exception of state officials sued for prospective relief. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). For the *Young* exception to be applicable, however, the plaintiff must demonstrate an ongoing constitutional violation, not simply that a violation has been committed. *See Green v. Mansour*, 474 U.S. 64, 71-73 (1985). Additionally, the plaintiff must assert his claims against the state official responsible for enforcing the law at issue in that person's official capacity. *See Walker v. Livingston*, 381 F. App'x 477, 478 (5th Cir. 2010)(citation omitted). Amerson has not alleged much less shown *ongoing* violations of federal law by any of the Defendants. Moreover, Amerson has been

transferred from MSP to EMCF as he requested, and, consequently, is no longer under the supervision of named Defendants. As such, the *Young* exception does not apply, and Eleventh Amendment immunity bars Amerson's claims against all Defendants in their official capacities.

## Qualified Immunity

Section 1983 authorizes suit against any individual who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. An assertion of qualified immunity often protects government officials performing discretionary functions from both litigation and liability on such claims. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 648 (N.D. Miss. 2013). When qualified immunity is asserted, as has been done here, the court must make two determinations. The court considers whether the evidence demonstrates a violation of a constitutional right. *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). The court additionally must determine whether the right at issue was clearly established at the time of the defendants' alleged misconduct. *Id.*

### *Alleged Retaliation by Captain Dudley*

Amerson *seemingly* alleges that Captain Dudley retaliated against him for complaints he filed against Dudley and other officials. Amerson makes much of an alleged instance when Dudley entered the zone on or about April 6, 2023, loudly daring him to keep filing grievances, which Amerson perceived to be Dudley's way of advising the other inmates that he was a snitch. *See* Doc. #s 1 at 5; 1-4 at 72. Amerson believes that Dudley's statement placed him in danger as inmates already suspected he was snitch because he is a "writ-writer." *See* Doc. # 1-4 at 72. In support of this belief, Amerson alleges that he was attacked by his cellmate (Carter) the same date (or shortly thereafter) Dudley made the alleged statement. *See* Doc. # 1 at 8-9. Amerson further

complains that Dudley ignored his request for a new mattress after providing one to another inmate in nearby cell. *See* Doc. # 1 at 11. Amerson also believes that Dudley conspired along with other named Defendants to falsely accuse him of misconduct resulting in RVRs. *See* Doc. # 1 at 5. In particular, Amerson points to an RVR following a urinalysis test in which he tested positive for methamphetamines—Amerson contends that Dudley falsified the results. *See* Doc. #s 1-3 at 13-16; 1 at 9.

While it is true that retaliation is not expressly referenced in the Constitution, it is nonetheless actionable because retaliatory actions tend to discourage an individual's exercise of constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). As such, it is clearly established that "[f]iling grievances and otherwise complaining about the conduct of correctional officers through proper channels are constitutionally protected activities, and prison officials may not retaliate against inmates for engaging in such protected activities." *Butts v. Martin*, 877 F.3d 571, 589 (5th Cir. 2017) (quoting *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir. 2009)) (internal quotation marks omitted).

"To prevail on a claim of retaliation, a prisoner must establish: (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998). The showing in such cases must be more than the prisoner's "personal belief that he is the victim of retaliation." *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir. 1995); *see also Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997). The Fifth Circuit has called for close scrutiny of retaliation claims in the prison context. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)("[c]laims of retaliation must … be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions"). The Fifth Circuit has explained as follows:

9

> To assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them, trial courts must carefully scrutinize these claims. To state a claim of retaliation an inmate must allege the violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive the complained of incident-such as the filing of disciplinary reports would not have occurred. This places a significant burden on the inmate. Mere conclusory allegations of retaliation will not withstand a summary judgment challenge. The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.

*Id.* at 1166 (internal citations and footnotes omitted).

Amerson's retaliation claim fails. While Amerson clearly *believes* he has been the victim of retaliation by Captain Dudley, his allegations and the evidence presented fails to make such a showing. Amerson's own allegations are inconsistent: on the one hand, he asserts that Dudley acted in a hostile manner towards him because he filed grievances against him, while on the other hand he argues that Dudley exhibited animosity towards him upon their first meeting, before any grievances had ever been filed. As such, he has not shown causation, i.e. that but for his filing of grievances, Dudley would have treated him differently.

Moreover, the Court is unconvinced that Amerson has identified, much less proven, the existence of a "retaliatory adverse act." A qualifying "retaliatory adverse act. . . [is one] capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006). Such qualifying events would be something like a transfer to a more dangerous unit. *See id.* at 687. The alleged statements by Dudley to other inmates which Amerson believes indicated he was a snitch do not quite rise to the level of a retaliatory adverse act in the Court's opinion, nor does rejecting a request for a new mattress. An attack by an inmate, without actual evidence of a causal connection between the attack and some action taken by the defendant, likewise fails to constitute a retaliatory adverse act. Conspiring to falsely accuse Amerson of misconduct resulting in RVRs would likely constitute a qualifying

retaliatory adverse act. Amerson, however, has failed to identify any specific RVRs of which Dudley was involved apart from the alleged falsified urinalysis test; and he has not produced anything other than his own allegations that Dudley falsified results.

Moreover, Amerson has not shown that Dudley's alleged actions deterred him from asserting any constitutional right, particularly the right to file grievances and/or complain about the conduct of Dudley or other correctional officers. Rather, Amerson—a self-proclaimed writ-writer—continued to (continues to) submit letters and grievances against Dudley and other MSP employees. *See* Doc. #s 67-8, 67-9. In sum, Amerson's claim against Dudley is based largely, if not entirely, on his beliefs and speculation, and is wholly unsupported. Consequently, Amerson has failed to establish the violation of a constitutional right by Dudley, and his claim(s) for retaliation against Dudley should be dismissed with prejudice.

*Alleged Failure to Protect by Dudley and Hampton*

Amerson *appears* to argue that the actions of Captain Dudley and Major Hampton made him a target of violence by other inmates. To establish a claim for failure to protect, the plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his needs for protection." *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995)(citations omitted). Deliberate indifference in this context means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference[,]" *Farmer*, 511 U.S. at 837, and "is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). "Mere negligent failure to protect is not actionable under § 1983, nor is deliberate indifference established by an official's failure to alleviate a significant risk that the official should have perceived but did not." *Brown v. Bufkin*, 2019 WL 322002, at *4 (S.D. Miss. July 17, 2019) (citations omitted).

11

Amerson opines that both Dudley and Hampton implied to other inmates that he was snitch, making him the target of threats and violence. Amerson alleges that either on April 4 or April 6, 2023, Dudley loudly told Amerson to keep writing him up; then, on April 6, 2023, Amerson's cellmate assaulted him. While Amerson believes that the two actions are related in that the former caused the latter, he offers no proof of such a causal connection. In fact, the incident report indicates that Amerson initiated the *physical* altercation by striking Carter in response to an accusation of theft. *See* Doc. # 67-8 at 9. As to Hampton, Amerson alleges that another inmate, Randy Littlejohn, showed him a knife, said "I'm gonna kill this bitch" and shouted that "Mama Hampton told me Lee is the police." *See* Doc. # 1 at 10. Littlejohn, however, never actually attacked Amerson, and MDOC approved Amerson's transfer request and rehoused him at the East Mississippi Correctional Facility on August 4, 2023. *See* Doc. # 67-7.

In sum, Amerson has neither shown that Dudley or Hampton acted with deliberate indifference to Amerson's safety, nor that their alleged actions resulted in the only physical altercation identified (the Quinton Carter incident). As such, Amerson has failed to establish a constitutional violation under the failure to protect theory, and such claims against Dudley and Hampton should be dismissed with prejudice.

*Alleged Due Process Violation*

The bulk of Amerson's allegations center around his belief that MSP employees conspired against him in falsely accusing him of misconduct resulting in institutional punishment. As discussed thoroughly above, Amerson takes issue with RVR # 01859490 which stemmed from the physical altercation between he and inmate Clayton.

To maintain a procedural due process claim, Amerson must show that the RVR at issue either: (1) affected or "will inevitably affect the duration of his sentence;" or (2) imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Sandin v. Conner*, 545 U.S. 472, 484, 487 (1995). After having been found guilty of the RVR at issue, Amerson was punished with loss of canteen and visitation privileges for a period of approximately six months (180 days). *See* Doc. # 67-3. While Amerson additionally complains that this RVR caused him to be held in "close custody" which, he alleges, impacts when he will be released from prison; the RVR itself merely "recommend[s] custody review." *See id*.

The deprivation of canteen and visitation privileges certainly does not affect the duration of Amerson's sentence, nor does it constitute an atypical or significant hardship. *See Watkins v. Lnu*, 547 F. App'x 409, 410 (5th Cir. 2013) (holding three-month loss of commissary, visitation, and telephone privileges did not implicate a liberty interest); *see also Cline v. Vasquez*, 2014 WL 5363885, at *2 (E.D. Tex. Oct. 21, 2014) (holding petitioner's claim concerning disciplinary segregation and the loss of email, phone and visitation privileges for 180 days do not implicate due process concerns); *Frechou v. King*, 2014 WL 172079, at *2 (S.D. Miss. Jan. 15, 2014) (holding plaintiff failed to assert a cognizable constitutional violation by losing prison privileges for 180 days). Moreover, the Supreme Court has held that prison visitation is not an independent right protected by the Due Process Cause. *Ky. Dep't of Corrs. V. Thompson*, 490 U.S. 454, 461 (1989) (rejected on other grounds by *Sandin*, 515 U.S. at 482). The Fifth Circuit Court of Appeals likewise has held that prisoners do not have a liberty interest in visitation. *E.g., Watkins*, 547 F. App'x at 410.

As to Amerson's allegation regarding a change of custody status, inmates have neither a protectable property nor liberty interest to any particular housing assignment or custodial classification, either under the United States Constitution or under Mississippi law. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995); *Wilson v. Budney*, 976 F.2d 957, 958 (5th Cir. 1992); *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (citations omitted); Miss. Code Ann. §§ 47-5-99

to 103 (1993). Prisoner classification is a matter squarely within the "broad discretion" of prison officials, "free from judicial intervention" except in extreme circumstances. *McCord*, 910 F.2d at 1250 (citations omitted). As such, the punishment for RVR #01859490 does not indicate the presence of a protectable liberty or property interest.

And while Amerson believes that the guilty finding on the RVR was erroneous, the finding was supported by evidence of a weapon found by an officer, that officer's statement, and review of video footage at the time. Due process only requires "some evidence" to support a disciplinary hearing finding, not absolute proof. *See Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 457 (1985) (holding procedural due process requires only some evidence to support findings made in disciplinary hearing). Moreover, an inmate does not have a constitutional right to be free from being charged with a disciplinary infraction, even if the report of the offense is untrue. *See Weathington v. Clark*, 2018 WL 1189400 at *3 (N.D. Miss. Mar. 7, 2018); *see also Brown v. LeBlanc*, 2013 WL 1947180, at *6 (W.D. La. Mar. 27, 2013), *report and recommendation adopted*, 2013 WL 1947174 (W.D. La. May 9,. 2013) (collecting cases).

The Court additionally notes the following: Amerson was given notice of the charge(s) and a hearing on the matter on November 14, 2022; Amerson did not deny assaulting inmate Clayton, rather he argued that he used an ink pen and not a homemade shank (or ice pick); and although Amerson did identify witnesses whom he believed would corroborate his assertions, the evidence presented shows that those witnesses refused to give statements and/or testimony. And, to the extent that Amerson believes that Defendants failed to follow their policy for institutional punishment, a mere failure to follow prison policy does not raise a constitutional issue. *See, e.g., Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (holding that "a prison official's failure to follow the prison's own policies, procedures or regulations does not constitute a violation of due process, if constitutional minima are nevertheless met").

In sum, neither the guilty finding on the RVR at issue nor the resulting punishment constitute a constitutional deprivation. Thus, Amerson's due process claim against Defendants should be dismissed with prejudice.

### Exhaustion

Because Amerson was incarcerated when he filed this action, the Prison Litigation Reform Act ("PLRA") applies to this case. *See* 28 U.S.C. § 1915A. The PLRA provides, in pertinent part, as follows:

> No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e (a).

The PLRA's exhaustion requirement is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Porter v. Nussle*, 534 U.S.516, 524 (2002). The Fifth Circuit takes a "strict approach" to exhaustion, holding that "[d]istrict courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012); *see also Days v. Johnson¸*322 F.3d 863, 866 (5th Cir. 2003). Moreover, prisoners must properly exhaust their administrative remedies before filing suit, which "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function affectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S.81, 90-91 (2006).

MDOC has been granted the statutory authority to adopt an administrative review procedure at each of its correctional facilities. Pursuant to this authority, it has established an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a complaint or grievance relating to any aspect of his incarceration. *See* Miss. Code Ann. § 47-5-

801.[3]    The ARP process is a two-step process that begins when an inmate first submits his grievance in writing to the prison's legal claims adjudicator within thirty (30) days of the complained of incident. *Howard v. Epps*, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The adjudicator, utilizing certain criteria, screens the grievance and determines whether to accept it into the ARP process. *Id.*

If accepted, the grievance is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate. *Id.* If the inmate is unsatisfied with the first response, he may continue to the Second Step by completing an appropriate ARP form and sending it to the legal claims adjudicator. *Id.* The Superintendent, Warden or Community Corrections Director will then issue a final ruling, or Second Step Response. *Id.* Importantly, "[i]ssuance of a Second Step Response is the *only* way to complete the grievance process." *Harris v. Turner*, 2021 WL 1565790 (N.D. Miss. Apr. 21, 2021) (emphasis added). If the inmate is unsatisfied with the second response, he may then file suit in state or federal court. *Id.*

Amerson filed an ARP grievance referencing Captain Dudley which is dated May 14, 2023. *See* Doc. # 67-9 at 3. In that grievance, Amerson stated that "Dudley is my enemy, he do not like me, an[d] I do not like him" and noted that Dudley rejected his request for a new mattress. *Id.* Although Amerson complained that other inmates were calling him a snitch, he did  not identify Dudley as the cause. *See id.* The grievance was received into the ARP in May 2023, screened, and accepted; but Amerson filed the instant action on July 19, 2023, before receiving a First Step Response, much less a Second Step Response. *See id.* As such, Amerson failed to exhaust his administrative remedies as to his claims against Dudley before filing this action.

---

[3] This program has been approved by this Court in *Gates v. Collier*, GC 71-6-5-S-D (N.D. Miss. 1971) (order dated Feb. 15, 1994).

Amerson filed one grievance regarding the November 6, 2022, altercation with Ira Clayton. *See* Doc. # 67-5 at 3-6. As it was an appeal from an RVR, no Second Step response was required before filing suit. *See Taylor v. Hollins*, 2018 WL 1572056, at * 5 (S.D. Miss. Mar. 30, 2018). A First Step Response was issued on March 21, 2023, *see* Doc. # 67-5 at 10, prior to the filing of this suit. Amerson, however, only identified Defendants Major Sharon Hampton and Warden Tracy McDonald in the grievance. Thus, at it pertains to his claims concerning RVR # 01859490, he only exhausted administrative remedies against those two defendants.

In sum, the competent evidence before the Court shows that Amerson failed to properly exhaust his administrative remedies prior to filing this action as to all claims and against all defendants *except* for his due process claims against Defendants Hampton and McDonald. The remaining claims should, therefore, be dismissed for failure to exhaust administrative remedies.

### Conclusion

Based on the foregoing discussion, the Court finds that the evidence set forth does not support Amerson's constitutional claims. Accordingly, Defendants' motion for summary judgment [67] is **GRANTED**, and judgment will be entered in their favor. A separate final judgment in accordance with this Memorandum Opinion and Order will issue today.

**SO ORDERED**, this the 2nd day of August, 2024.

/s/ Roy Percy
UNITED STATES MAGISTRATE JUDGE

17